and the next case for argument is Ford v. Brennan. It is docket 21-4086. Ms. Tomczyk we're ready to hear from you when you're ready but if you were going to grab a glass of water please do. Thank you. Let me do that really quickly. Can you hear me okay? Yes. Thank you. May it please the court, Jennifer Tomczyk on behalf of appellant Howard Ford who's observing remotely today. The district court's summary dismissal of Mr. Ford's claims for FMLA interference and retaliation, disability discrimination, and failure to accommodate should be reversed. The district court improperly weighed disputed facts and ignored material evidence to reach a number of factual findings without which its dismissal cannot properly stand. Counsel, can I ask you a question about your failure to accommodate claim and why it is we should consider it exhausted? Yes. So the failure to accommodate claim, the standard for whether it's exhausted is whether it was raised in the EEOC charge and whether it can be investigated. And the case law on this is the Jones v. UPS and also the more recent claim or more recent case of Garrovick which was just issued March 1st, 2013. I believe Judge Murphy was on the panel for that case. Under those two cases, whether a claim has been exhausted depends on whether the conduct is described in the EEOC charge such that it would be reasonable to expect an investigation. Here, not only was the conduct described in the investigative charge, but it was actually investigated. If you look on page Then why was it necessary to seek a motion to clarify and a motion to amend? I was not counsel at that point, so I don't know why that particular counsel decided to do that. But if you look at the appendix on pages 114 through 116, you can see that there are specific questions related to the accommodation and why it was not provided. So for example, it asks specifically, sorry, let me just quickly get there. Is this the investigative affidavit that you're referring to? Yes, Your Honor. And in doing that affidavit, the EEOC asks, have you been offered an accommodation for your work restrictions? If no, what was offered? Mr. Ford responds. Did you regard the offered accommodation as effective? If not, why? Mr. Howard Ford responds. Are the current duties you perform an accommodation for your medical condition? You can see from this investigative affidavit that the EEOC did actually investigate the failure to accommodate. So it satisfies the standard applicable under Jones v. UPS and the more recent Gariffic case. Now, in its response, the post office asked this court to perpetuate the errors of the district court, either to weigh the evidence in a light that's least favorable to Mr. Ford or to disregard relevant evidence and fragment its review of the conduct that Mr. Ford has alleged. The post office's primary argument is easily disposed of, however. Specifically, it argues that the court can only consider the totality of the circumstances if there's a hostile work environment alleged. Now, this is a curious argument because in the post office's undisputed facts, this is on A84 of the records, in paragraph 31, where they're describing the claims that he has alleged, it specifically states that he had alleged claims, quote, that management had created a hostile work environment. So by their own undisputed facts and the standard that they suggest that the court follows, the court should review all of the evidence that Mr. Ford has alleged. And this is consistent with EEOC guidance and case law, as well as case law from this jurisdiction, which suggests that the court should look at all of the conduct alleged. So where was the hostile work environment claim raised? I understand you're pointing us to the government's understanding. Where was it raised by your client? It's repeatedly referenced in the EEOC charge, as well as in the pleadings. If you look at our reply, footnote number one, I think that's on page seven. There are a number of different sites. It's only example sites. It's not exhausted. But there are numerous places where the hostile work environment and the conduct that leads to the hostile work environment are described. So here, the court made improper fact findings as to every single element of the claims Mr. Ford made, except that he was physically and mentally disabled from an on-the-job work injury and was entitled to FMLA relief, which is conceded in Ford's favor. Looking at the adverse employment action requirements, Mr. Ford presented evidence beginning in April 2013 that a supervisor bullied, berated, and harassed him on a nearly daily basis, that she interfered with his FMLA leave by threatening to run him AWOL. Let me ask you this. On the discrimination claim, was his injury that he was discriminated against and therefore denied accommodations? Is that the consequence of the discrimination? So for his discrimination claim, there are two separate claims. There are the disability discrimination claims, which show that the terms, conditions, and privileges of his employment were altered because he was in disabled status. And the evidence shows that he was eventually terminated because of this discriminatory conduct. If we disagree with you that there was no termination, does that aspect of the discrimination claim go away? No, Your Honor. Roberts v. Roadway is very instructive on this point. In that case, the court upheld a finding of adverse employment action. It was a termination that was withdrawn, like this case. My question is, assume you lose on that. Then that part of the discrimination claim goes away. You said there were two parts. Two different claims. There's the disability discrimination claim, and then there's the failure to accommodate claim. The failure to accommodate claim is different than the disability discrimination because you don't have to show an adverse employment action. Okay, what is the consequence of the discrimination on the disability claim? I'm sorry, I don't understand your question, Your Honor. In what way was he discriminated? I understand that there was some rough language and language may not have been used. What I want to know was, how was that effectuated to hurt him? Sure. So, it's a hostile work environment claim. So that she, on a daily basis, made his life miserable. Made it impossible for him to work in a way without fear that he was going to be bullied, berated, harassed. So is this emotional distress? There's an emotional distress component to it. There's also that she issued letters of warning. She threatened to run him AWOL. She made it so that he could not go to work without her standing over him, watching everything that he did, and yelling at him. She called him lazy. She called him, excuse my French, a piece of shit. She would not let him do, she would not accommodate his workplace restrictions, which is, yes, part of the failure to accommodate, but also indicative of the discriminatory animus. And we don't have to ask why she was doing this. She told Mr. Ford and anybody that would listen to her that she did not like that she had to accommodate him, that she did not think that he was entitled to FMLA leave, and that she was going to, quote, fix him so that he would not take advantage of these protected rights that he had. It looks to me like he got all the accommodations. There's the one incident where he had to use the bigger cart. But that was corrected, albeit maybe too late. But other than that, it seems to me that he was accommodated. I respectfully disagree, Your Honor. Tell me why. In our briefs, we indicate that there were nine different times that he requested accommodations, all of which were denied. Most of them were requests for accommodations that had previously been given to him and which she removed when she started working for him. They were simple things, requests for advanced sick leave. They were requests that he be allowed to continue to employ his workplace restrictions. They were the, sorry, I have them listed here, that he continue to have the eight-hour restriction on his workplace. He got in trouble and issued a letter of warning when he used the eight-hour restriction. She refused to let Mr. Ford change his schedule for his disability. This was part of the interference with the FMLA. There is the U-cart issue that you talked about wherein at the time that he was loading his truck in the way that he had been doing for the last six years since he was injured, and his supervisor came over and told him she would not let him load the truck that way. And he said, please, this is what my doctor ordered. I do not want to exacerbate my injury. And she said, I don't care. Do it now. She removed accommodations that had previously been provided. I have a question precisely about that. Sure. So on July 16th, what were his accommodations that were, that should have been known to Ms. Clark, that were in the file, so to speak? There was the eight-hour workday restriction, right? There's the eight-hour workday restriction. There's the, these are listed in our brief. Let me. Was there a weight lift, lifting restriction as well? I believe there was. Hold on. I believe this is on page nine of our opening brief. It was an eight-hour workday restriction, intermittent tardiness, use of the U-cart to make two trips to his vehicle rather than the orange parcel gurney, no lifting over 15 pounds, use of an FFV left-hand brake vehicle, no overhead lifting, and intermittent use of FMLA time for his approved conditions. So those were the accommodations that he had at the time that she became his supervisor. And she immediately started to remove those accommodations and refuse requests for additional accommodations. So on July 16th, we should not be thinking about that as a request for an accommodation with respect to the cart, correct? Well, yes and no. It was an existing accommodation that had already been requested that she removed without giving him any notice or opportunity. But he also requested it again at that time and said, please, let me do this. This is the way my doctor has prescribed that I do this. And she said, no, do it the way that I want. So then he went and got a doctor's note, and then on July 22nd, his request was fulfilled, accommodated, right? No. So he came back with a doctor's note, and he asked her, did you receive my workplace restrictions, asking if she's going to accommodate the restrictions that he has asked for. And she said, those were just suggestions. And I think something that's really informative here is that after he provided the note, there was, I think it was HRMS, told her, told the supervisor, you need to accommodate Mr. Ford. And she argued with them and said, I don't see why we need to do this. So it's clear that she knew she was supposed to accommodate him and that she refused to. And there are a number of requests after that July 29th date wherein he requested an additional accommodation, and they refused. That was the last day that he was at work, right? Yes. I thought there were a number of offers of accommodations and they were not taken, either because of psychological need for accommodation and so forth, but he could never physically return to work. He never physically returned to work. He did ask for additional accommodations that the post office refused to give him. Like what? He asked for advanced sick leave. He asked that they, so his attorney requests, and there are two different attorney requests in addition to a doctor's note. But didn't the doctor say he can't return to work by then? No, the doctor said that he could return to work with an accommodation, and the accommodation was in the form of them reassuring him that they would not remove his accommodations at the whim of a hostile supervisor. I see that my time is about up. I'd like to reserve a little bit of time for my rebuttal. Thank you.  My name is Tyler Murray on behalf of Megan Brennan, Postmaster General of the United States. The trial court properly granted summary judgment in this case. I'd like to go back to a couple of questions that the court had earlier. One question was, what were the restrictions that were known on July 16th? What were the restrictions that were known in the file? There were two, and this was made clear at the summary judgment hearing when the court asked defendants counsel that very question. And that is on, in the summary judgment hearing transcript. And the two that were known on that time were the eight-hour workday restriction and a 25-pound lifting restriction. There was nothing about pushing or pulling a cart. Well, where did that come from, the gurney versus the cart? Are you saying that that was something that the postal authorities were even unfamiliar with at that point? I think what the record shows in the hearing on the motion to alter the judgment, there was a document that was provided during that hearing that talked about, in 2007 there was a union discussion about, hey, can postmen use the orange gurney and make one trip, or can they use the U-cart and make two trips? And the ultimate decision there was that, well, yes, the management can ask them to use the one gurney cart as long as they ask them to do that safely. At best, what was happening prior to July 16th was an informal accommodation, nothing that had been recognized or formally put in the file that Ms. Clark would have known about. So was his conversation with Ms. Clark on the 16th about his needs based on his disability a request for an accommodation? Sure, that could have started the process. When there's a non-obvious disability and someone asks for an accommodation, that can start the interactive process. So what you're saying is that there's no requirement to immediately accommodate? That's correct, Your Honor. Is that right? That's correct. And why is that? Why should we create a situation where an individual who's disabled, there is a record of restrictions for his ability to work, have to injure himself in order to then successfully satisfy the third element of his claim? The case law talks about an interactive process that started when there's a non-obvious disability. Is that a genuine dispute of fact, whether it was a non-obvious disability here? I don't think it was. There was nothing in his file prior to that that would show he had any restrictions on pushing and pulling. In fact, the note that was in the file showed that specifically, where there was a remark, any restrictions on pushing and pulling, and it was blank. So there's no dispute about, at that time, that started the process. He asked for an accommodation. In that context, in the moment, when people are working, they're loading their trucks, it's okay for the post office to say, well, let's get the trucks loaded and then let's work on that. Let's start this interactive process. He got that doctor's note just a few days later on July 22nd, and from that point on, even if his supervisor said, oh, these are only suggestions, the undisputed facts remain that he was able to use the U-cart and make two trips from that point forward. After he was injured? After he had returned to work, absolutely. But after he was injured? After he was injured, yes. But he did come back to work just a few days later and was able to use the carts. So, again, that question came up at the district court level, and Mr. Ford's attorneys responded that in that very moment, the issue was, well, he needs to comply with his boss's orders, and if that's a problem, to grieve it. Unfortunately, he was hurt on that day. But in that moment, the request for accommodation was made and it started the process, but they can't grant those immediately. It would just become an unworkable situation at that point. With respect to whether a hostile work environment was alleged in this case, it was not. The operative complaints in this case have the first complaint included claims for FMLA retaliation and interference. The second had claims for gender, age, and disability discrimination. Those claims, the gender and age claims, were dismissed at the summary judgment stage. And then we went on the litigation. The complaints were consolidated and we litigated the case. We did discovery. We did motion practice. At motion practice, the local rule in Utah requires the moving party to list out the elements of each claim and the undisputed facts related to each of those. The post office did that in the summary judgment briefing, didn't lay out the elements of a hostile work environment claim. In response to that, there was no, hey, there's no hostile work environment claim. You missed something. There is a hostile work environment claim here. It just wasn't litigated at the district court. The post office never had an opportunity to respond in response to pleading to hostile work environment and never had the opportunity to conduct discovery on it, and there was no motion practice on it. Now, the fact that the phrase hostile work environment might have been mentioned in investigative affidavits, maybe in the EEOC proceedings, is a far cry from pleading a claim, putting it subject to responsive pleading and motion practice and discovery. That didn't happen here, and the district court noted that, and he said that the historical fact that maybe somebody mentioned that hostile work environment phrase is insufficient to put the court or the defendant on notice in this case, and particularly given the failure to prosecute this claim in any meaningful way during the litigation. So there was no hostile work environment claim alleged here in this case. With respect to the exhaustion of remedies for the failure to accommodate claim, the courts had questions about those. The response is, well, in the investigative affidavit, the defendant might have answered some questions or put some things on there, and so the EEOC really did investigate it. The EEOC acknowledged that a hostile work environment, or excuse me, a failure to accommodate claim was not made at the administrative level. The first, the informal, excuse me, Mr. Ford contacted an EEO counselor on September 4th of 2013, filed an informal complaint on September 11th, filed a formal complaint in October, I think, 8th of 2013, and then in November, on November 7th of 2013, the EEOC puts together a little packet and says, these are the claims we're accepting for investigation, here they are. If you disagree, let us know. And in response to that claim, Mr. Ford didn't respond and say, hey, hey, you missed my failure to accommodate claim. Failure to accommodate wasn't mentioned. The first time it was mentioned was in October of 2014, when he filed, when they contacted the EEOC again, and then tried to raise the 2013 failure to accommodate. Is this the motion to clarify, the motion to amend? The motion to clarify was then filed almost a year later, I think in April of 2015, after the EEOC, I think in December of 2014, issued an opinion, and told Mr. Ford flatly that you didn't, in the September 2013 complaint, you did not raise any issue about failure to accommodate. The ALJ never acted on the motion, right? That's correct. Is that necessary for exhaustion? Your Honor, I don't know the answer to that. But I would, the position, as a practical matter, if it had gone through all those, if a failure to accommodate claim had been raised and brought at that point, then there wouldn't have been a need for a motion to clarify. It just wasn't there. I don't think there needs to be an exhaustion. I think the EEOC had made its position really clear in the December 9, 2014, decision that the failure to accommodate claim was not raised. Which respect to? Is there a question on exhaustion as to the two disability, or excuse me, the two discrimination claims? No. The failure to exhaust arguments go to the failure to accommodate claims. The discrimination claims, those were raised. Yes. Only. Yeah. With respect to the court's question about, you know, how often was he accommodated and when was there a failure to accommodate, counsel mentioned that there were nine times that he was denied accommodations. Under the case law, under our circuit's case law, in the Proctor case, other circuits' case law, I mentioned this as well, each requested failure to accommodate is an individual act of discrimination that must be first exhausted and then asserted in a district court complaint. Those nine times that were mentioned starting in April 2013, those were not exhausted. Those were not raised at the administrative level, and so therefore they can't be brought here. Each of those must be alleged. Why do you contend there is no adverse action in this case? The way I understand it, there's two allegations of adverse actions here. One was that Mr. Ford was terminated, and the other was that there was this collective problems, essentially a hostile work environment, a collective problems. With respect to the termination, we honor the standard that in reviewing a summary judgment, that reasonable inferences from the facts have to be made in favor of the non-moving party. But here, Mr. Ford is inviting the court to make an unreasonable inference from the facts with respect to termination. Here are the undisputed facts in the record with respect to Mr. Ford's termination. On October 7, 2014, the Postal Service sent a notice of separation to Mr. Ford, and it said this is not disciplinary in any way. It's because you've been on leave without pay status for more than 365 days. That happened. That's an A252 in the record. But that letter also gave Mr. Ford the opportunity to say, hey, you can grieve this. He did. And on November 10th of 2014, that notice of separation was rescinded. And similarly, on November – that's – How should we be thinking about the fact that it was rescinded? Doesn't that suggest it had an adverse component to it? It had a potential adversity to it, for sure. I mean, that it – Until it was rescinded, it was adverse? Was the fact that it was rescinded mean it was – No, no. My question is that I thought that it was – I'm trying to understand how to receive the fact that it was rescinded in connection with understanding this as your argument, that this was not an adverse action. Well, because it never happened. His status as being on leave without pay didn't change from the time he essentially left the office or the post office on July 29th of 2014 through the time that he was able to do a disability retirement. That entire time, his employment status did not change. First, he was on some FMLA leave, then some unscheduled sick leave, and then he was on leave without pay from, I think, October 8th, 2013 through the end. His employment status never changed. There was no change. There was a potential for a change, but under the case law, that's not enough. That potential's not enough. And note that everyone operated under the assumption that he was on leave without pay. When he applied for his disability retirement, OPM sent a letter to the post office and said, we understand he has not been separated. The post office's own document at A100 shows that at the time his retirement was processed, he was on leave without pay status, and his own testimony, he gave a deposition, and he said in his deposition, I was financially separated from the post office on May 4th, 2015. The only record of termination, the only record that says termination is a very terse document, the record at C102. It says it was last modified on June 3rd, 2015, which is after the day of his retirement, and that document reflects he was terminated. That's the string or the thread that they try and hold onto and say that he was actually terminated. Is terminated a term of art that means something other than terminated? Not that I'm aware here, but the fact that it says his employment status is terminated after his retirement has been processed does not give rise to an inference that he was terminated back in October of 2014 secretly, and that no one who worked on it from that time, from his union to the OPM to the post office, decided that he was terminated, that this just didn't happen. The other, I'm almost out of time, Your Honor. We stand by the arguments set out on our brief and urge the court to affirm the district court for all the reasons in our briefing and in the district court's opinion, and we submit. Was he denied health benefits? I looked into that, Your Honor. It looks like that after, at the 365 days mark, by regulation, the benefits are terminated. My understanding, and this I don't think is in the record, is that he might have purchased those again, but you can pay for them out of pocket, but I think after October of 2014, the benefits terminate by operational law, after being on leave without paying. Even if the separation from service was rescinded in November, that didn't rejuvenate him because they were going to end anyway? Yes. Okay. I'm going to try to quickly respond to some of the questions you posed to opposing counsel. So the request for accommodation and the argument that it was never documented, there's evidence they knew about it. We've already talked about it. It's in footnote one, page nine of our brief. But the fact that he asked for it, the request is noticed. Under the EEOC guidelines, request is noticed, and an employer cannot ignore it. But even more importantly, she didn't request a doctor's note. There's no evidence in the record that she requested a document's note. She said no and told him to load the cart the way that it was. So he did request an accommodation. She ignored it, and it wasn't for documentation reasons. With respect to the hostile work environment claim, the court doesn't even need to decide whether a hostile work environment claim was made. There are a number of reasons why it should, and we've already addressed those. But even under this court's other case law, the court should consider the totality of the circumstances. And Roberts v. Roadway is very instructive in this case. That was not a hostile work environment claim. Sorry, I see that my time is up, so I just asked. Do you want me to finish? You have another minute. Okay. Oh, sorry. The fact finder there did decide that it was an adverse employment action under exactly the same facts, almost exactly the same facts that are alleged here. He was terminated. He had to grieve his termination to get it removed. There's evidence that it wasn't removed from his file, and he was subject to a number of warnings from her. And then finally, just to end, that he has established a prima facie case of all of the elements necessary. The court inappropriately removed them from the fact finder, and this should be remanded for trial so an appropriate fact finder can weigh the evidence in this case. Thank you, Your Honors. Great. Thank you for your arguments. We kept the time about almost exactly even within a couple of seconds. The case is submitted, and Counselor excused. Thank you for your arguments.